[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13467

_____

D.C. Docket No. 1:16-cv-23020-RNS

JUAN CARLOS GIL,

Plaintiff - Appellee,

versus

WINN-DIXIE STORES, INC.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 7, 2021)

Before JILL PRYOR and BRANCH, Circuit Judges, and REEVES,[*] District
Judge.

BRANCH, Circuit Judge:

_____

[*] Honorable Danny C. Reeves, United States District Chief Judge for the Eastern District of
Kentucky, sitting by designation.

Appellant Winn-Dixie Stores, Inc. ("Winn-Dixie"), a grocery store chain, operates a website for the convenience of its customers but does not offer any sales directly through the site. Appellee Juan Carlos Gil ("Gil") is a long-time customer with a visual disability who must access websites with screen reader software, which vocalizes the content of the web pages. Unable to access Winn-Dixie's website with his software, Gil filed suit against Winn-Dixie under Title III of the Americans with Disabilities Act ("ADA").[1] After a bench trial, the district court found that Winn-Dixie's website violated the ADA. *Gil v. Winn-Dixie Stores, Inc.*, 257 F. Supp. 3d 1340, 1345 (S.D. Fla. 2017). Winn-Dixie timely appealed. After the benefit of oral argument and careful consideration, we vacate and remand.

## I.

Winn-Dixie owns and operates grocery stores in the Southeastern United States. It is undisputed that Winn-Dixie only sells goods in its physical stores and does not offer any sales directly through its limited use website. The website's primary functions at issue in this appeal are the ability to re-fill existing prescriptions for in-store pickup, and to link digital manufacturer coupons to the

---

[1] This opinion addresses the functionality and accessibility of Winn-Dixie's website as of the time that Gil filed the underlying complaint in July 2016.  Any changes to the website that may have occurred since then are not within the scope of this appeal.

customer's Winn-Dixie rewards card so that the coupons are applied automatically upon check out at a physical store.[2]

For over fifteen years, Gil, who is legally blind, frequented Winn-Dixie's physical grocery stores to shop and occasionally to fill his prescriptions. Upon learning of the existence of Winn-Dixie's website, Gil visited the site and discovered that it was incompatible with screen reader software, which he uses to access websites and vocalize the site's content.[3]

On July 1, 2016, Gil brought this action in the form of a single claim under Title III of the ADA, 42 U.S.C. §§ 12181–12189, alleging in his complaint that he was a Winn-Dixie customer, and that he was "interested in filling/refilling pharmacy prescriptions on-line," but was unable to access the website because it was incompatible with screen reader software. Gil alleged that the website itself was "a place of public accommodation under the ADA," and that the website had

---

[2] Many of the various informational services on Winn-Dixie's website (including those not at issue) are provided by third-party vendors. Winn-Dixie's website also includes a store locator function, which Gil was unable to access with his screen reader software. However, at trial, he testified that he had no problem finding businesses (including Winn-Dixie stores) without using Winn-Dixie's website—he instead used Google. And in his response brief and at oral argument, Gil focused on his inability to access the prescription refill feature and the coupon-linking tool as the primary violations of the ADA. Accordingly, this opinion will focus on those features as opposed to the store locator feature.

[3] Gil uses two of the variety of screen reader software available. After making several attempts to access Winn-Dixie's website using two different screen reader software programs, Gil determined that "90 percent" of the Winn-Dixie website was incompatible with screen reader software. In their joint pre-trial stipulation, the parties agreed that Winn-Dixie's website "was not designed specifically to integrate with screen reader software."

3

"a direct nexus to Winn Dixie grocery stores and on-site pharmacies." Thus, he asserted that Winn-Dixie violated the ADA because the website was inaccessible to visually impaired individuals, and, therefore, Winn-Dixie "ha[d] not provided full and equal enjoyment of the services, facilities, privileges, advantages and accommodations provided by and through its website www.winndixie.com." Gil sought declaratory and injunctive relief, attorney's fees, and costs. In particular, Gil requested an order requiring Winn-Dixie to update its website "to remove barriers in order that individuals with visual disabilities can access the website to the full extent required" by Title III.[4]

Winn-Dixie answered the complaint, admitting that "its physical grocery stores and pharmacies are places of public accommodation," but denying the complaint's allegations that its website was a place of public accommodation and

---

[4] Gil did not indicate in his pleadings which provision of Title III of the ADA Winn-Dixie was violating, and the district court focused on the general discrimination provision, 42 U.S.C. § 12182(a), which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." However, Title III also provides more specific examples of what constitutes discrimination by a place of public accommodation, including where an operator of a place of public accommodation "fail[s] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* § 12182(b)(2)(A)(iii). Based on the briefing of the parties in this appeal and the arguments made at the bench trial, we conclude that the gravamen of Gil's argument was that Winn-Dixie was in violation of Title III of the ADA because it discriminated against him on account of his visual disability when it failed to provide auxiliary aids and services to make its website accessible with screen reader software, which prevented him from fully and equally enjoying the "goods, services, privileges, or advantages" of Winn-Dixie, in violation of 42 U.S.C. §§ 12182(a) and (b)(2)(A)(iii).

4

in violation of the ADA. The parties then engaged in discovery, and on October 24, 2016, Winn-Dixie filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that the ADA's "public accommodation" provisions do not apply to its website because the site is not a physical location and lacks a sufficient "nexus" to any physical location.

On March 15, 2017, the district court denied the motion for judgment on the pleadings. *Gil v. Winn Dixie Stores, Inc.*, 242 F. Supp. 3d 1315, 1316 (S.D. Fla. 2017). The court acknowledged that the circuit courts are split on the issue of whether the ADA limits places of public accommodation to physical locations. *Id.* at 1318. It noted that this Circuit has not specifically determined whether websites are public accommodations under the ADA, but cited *Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279 (11th Cir. 2002) as offering guidance. The court reasoned that *Rendon* extends the ADA's coverage to "intangible barriers" that restrict a disabled person's enjoyment of the "goods, services, and privileges" of a public accommodation. *Gil*, 242 F. Supp. 3d at 1319. It agreed with other district courts within this Circuit that have held that websites are subject to the ADA if a plaintiff shows a sufficient "nexus" between the website and physical premises. *Id.* at 1319–20. Ultimately, the court concluded that "Winn-Dixie's website is heavily integrated with, and in many ways operates as a gateway to, Winn-Dixie's physical store locations." *Id.* at 1321. The court thus found that Gil had shown a sufficient

nexus between the website and Winn-Dixie's physical stores such that Winn-Dixie was not entitled to judgment as a matter of law. Viewing the facts in a light most favorable to Gil, the district court held that the website's inaccessibility denied Gil "equal access to the services, privileges, and advantages of Winn-Dixie's physical stores and pharmacies." *Id.* at 1321. The court also concluded that it "need not determine whether Winn-Dixie's website is a public accommodation in and of itself." *Id.*

At the bench trial, Gil testified that in the fifteen years during which he shopped in Winn-Dixie stores, when he needed to re-fill a prescription, he would ask an associate to guide him to the pharmacy area where he would tell the pharmacist what he needed, and he would wait anywhere from 20 to 30 minutes for the prescription. He explained that he was uncomfortable requesting his prescription refills in person because he did not know who might be standing near him and could overhear his conversation. Therefore, when he learned Winn-Dixie had a website, he was interested in utilizing its potential online capabilities so that he would not have to request help from Winn-Dixie employees in refilling his prescriptions. Upon determining that he was unable to use much of the website's functionality, however, Gil decided to discontinue shopping at Winn-Dixie's physical stores entirely. He testified at trial that he was "deterred" from going to the physical store, not by any change in the physical access available to him at the

6

physical store, but due to his frustration with the lack of functionality on the website. He last shopped there in the summer of 2016 but testified that he will return to shopping at Winn-Dixie's physical stores when the website is accessible to him.

Gil also mentioned for the first time at trial that he was interested in using the coupon linking option of the website, which permits customers to use the website to link manufacturer's digital coupons to the customer's Winn-Dixie rewards card for automatic application at checkout.[5] He explained that he used coupons before when he shopped in the physical stores, but due to his visual impairment, the only way for him to get coupons was to ask a friend to read the newspaper coupons to him or ask Winn-Dixie employees for assistance.

After a bench trial, the district court entered judgment in favor of Gil, finding that Winn-Dixie had violated Gil's rights under Title III of the ADA. *Gil v. Winn-Dixie Stores, Inc.*, 257 F. Supp. 3d 1340 (S.D. Fla. 2017). Specifically, the court noted again that it need not decide whether Winn-Dixie's website is a public accommodation "in and of itself," because the website is "heavily integrated" with Winn-Dixie's physical stores—so much so that it "operates as a gateway to the

---

[5] All of Gil's pleadings leading up to trial focused solely on his inability to access the prescription refill tool on the website. At trial, however, Gil for the first time asserted that he also sought to access the coupon linking feature, and the parties litigated this issue as though Gil raised it in his pleadings. Thus, there is no indication that Winn-Dixie suffered any prejudice from the addition of this belated claim.

physical store locations," *id.* at 1348–49. It held that, as the ADA "requires that disabled people be provided 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ,'" the fact that the website is "inaccessible to visually impaired individuals who must use screen reader software" means that Winn-Dixie has violated the ADA. *Id.* at 1349 (quoting 42 U.S.C. § 12182(a)). The district court issued an injunction that, among other terms, required Winn-Dixie to make its website accessible to individuals with disabilities, specifically by conforming its website—including "third party vendors who participate on its website—to Web Content Accessibility Guidelines 2.0 ("WCAG 2.0"), which is a set of accessibility standards generated by a private consortium.[6] *Id.* at 1351. The injunction also required Winn-Dixie to implement a publicly available Web Accessibility Policy, "provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to" its website on an annual basis, and conduct accessibility tests of the website every three months. *Id.* Winn-Dixie appealed.

---

[6] There is some dispute as to how much it would cost to bring the website into compliance, but Winn-Dixie represents that it would cost $250,000.

## II.

Winn-Dixie raises three key issues on appeal: (1) whether Gil has standing to bring this case, (2) whether websites are places of public accommodation under Title III of the ADA, and (3) whether the district court erred in its verdict and judgment in favor of Gil, including the court's injunction. After first addressing the standing issue, we turn to whether websites are (in and of themselves) places of public accommodations under the ADA.[7] We then determine whether Winn-Dixie's website violates the ADA.

"We review standing determinations *de novo*." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

Following a bench trial, we review the district court's conclusions of law *de novo*, and its factual findings for clear error. *AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1301 n.4, 1308 (11th Cir. 2015). We review the grant of an injunction for abuse of discretion. *Simmons v. Conger*, 86 F.3d 1080, 1085 (11th Cir. 1996).

### A. Standing

As an initial matter, we address Winn-Dixie's argument that Gil lacks standing to bring this action—in particular, that Gil has suffered no injury in fact.

---

[7] Winn-Dixie also argues that the district court erred in denying its motion for judgment on the pleadings. Because we vacate the final judgment, we do not address the judgment on the pleadings issue.

Gil argues that his inability to access Winn-Dixie's website is a particularized injury in fact.

The Constitution limits the jurisdiction of federal courts to "cases" and "controversies," U.S. Const. Art. III § 2, and "the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). The elements of standing are (1) "injury in fact," (2) a causal connection between the injury and the conduct complained of, and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The "injury in fact" element requires a plaintiff to demonstrate a personal stake in the litigation and an "[a]bstract injury is not enough." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). In addition, when seeking injunctive relief, a plaintiff "must show past injury and a real and immediate threat of future injury" that is not "conjectural" or "hypothetical." *Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 560 (1992); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013). Further, if a party seeks an injunction under Title III, the party "either must have attempted to return to the non-compliant building" or "intend to do so in the future." *Houston*, 733 F.3d at 1336 (citations omitted).

10

Of the required elements of standing, Winn-Dixie disputes only whether Gil has suffered an injury in fact, given that he was able to use the physical stores for years before he knew the website existed. While Gil does not dispute that he was able to access the physical store without impediment, he argues that he suffered an injury both when "he was unable to avail himself of the goods and services" on the website and when the website interfered with his "ability to equally enjoy the goods and services of Winn-Dixie's stores." The difficulties caused by his inability to access much of the Winn-Dixie website constitute a "concrete and particularized" injury that is not "conjectural" or "hypothetical," and will continue if the website remains inaccessible. *See Muransky*, 979 F.3d at 925; *Lujan*, 504 U.S. at 560–61. Accordingly, Gil has Article III standing to bring the case.

## B. Websites and Public Accommodations

Turning to the merits, this case presents two primary issues: (1) whether Winn-Dixie's website is a place of public accommodation in and of itself, such that its inaccessibility violates Title III; and (2) if it is not a place of public accommodation, whether the website otherwise violates Title III.

### 1.  Is the website, in and of itself, a place of public accommodation under Title III?[8]

We must first determine whether Winn-Dixie's website is considered a place of public accommodation under Title III of the ADA.

Congress passed the ADA in 1990 and amended it in 2008. "[T]he ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III). *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

Our analysis in this place of public accommodation case begins with the text of Title III. Under Title III, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of *any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added).

---

[8] As noted above, the main premise of Gil's complaint was that Winn-Dixie's website itself was a place of public accommodation under Title III, but the district court twice declined to reach this issue. Because, as discussed further in this opinion, we reverse the district court's holding related to the website being an intangible barrier to Winn-Dixie's physical stores, we necessarily must reach this issue in order to determine whether there is another basis for affirming the judgment. We also note that, although Gil did not advance this theory in his response brief or at oral argument, he was on notice that it was a potential issue before this Court because he raised the issue in his complaint and the appellant Winn-Dixie raised the issue in its briefing on appeal.

Title III then provides more specific examples of what constitutes

discrimination for purposes of § 12182(a). *Id.* § 12182(b)(2)(A)(i)-(v).[9] The only

provision relevant to this appeal is § 12182(b)(2)(A)(iii), which provides that

---

[9] Specifically, Title III provides that:

For purposes of subsection (a) of this section, discrimination includes—

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

(iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

(v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

42 U.S.C. § 12182(b)(2)(A).

discrimination occurs when an operator of a place of public accommodation

"fail[s] to take such steps as may be necessary to ensure that no individual with a

disability is excluded, denied services, segregated or otherwise treated differently

than other individuals because of the absence of auxiliary aids and services." *Id.*

§ 12182(b)(2)(A)(iii). A place of public accommodation does not have to provide

auxiliary aids or services if "taking such steps would fundamentally alter the nature

of the good, service, facility, privilege, advantage, or accommodation being offered

or would result in an undue burden." *Id.*

So what is a "a public accommodation" under Title III of the ADA? It is

defined as follows:

> The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--
>
> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7). This section provides an expansive list of physical locations which are "public accommodations," including, as is relevant here, a "grocery store." *Id.* The list covers most physical locations in which individuals will find themselves in their daily lives. Notably, however, the list does not include websites.

The Department of Justice, responsible for promulgating regulations to implement the ADA, 42 U.S.C. § 12186(b),[10] has provided a detailed explanation

---

[10] The section provides:

Not later than 1 year after July 26, 1990, the Attorney General shall issue regulations in an accessible format to carry out the provisions of this subchapter not

of the meaning of "public accommodation." 28 C.F.R. § 36.104. The regulation echoes the language of the statute, listing a plethora of physical spaces including "[a] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," not including websites.[11] *Id.*

Our analysis is straightforward. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous . . . [our] 'judicial inquiry is complete.'" *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969 (11th Cir. 2016) (quoting *Conn. Nat'l Bank*, 503 U.S. at 254).

The statutory language in Title III of the ADA defining "public accommodation" is unambiguous and clear.[12] It describes twelve types of locations

---

referred to in subsection (a) that include standards applicable to facilities and vehicles covered under section 12182 of this title.

42 U.S.C. § 12186(b).

[11] Gil points to historical statements made by the Department of Justice to imply that the Department of Justice supports his position that websites should be subject to Title III. The Department of Justice, however, has never issued a final ADA regulation concerning whether websites are places of public accommodation.

[12] Gil relies on legislative history to support the notion that Congress intended an expansive definition of "public accommodation" in the ADA that would change with evolving technologies. But we have previously held that "Congress has provided, in Title III of the ADA, a comprehensive definition of 'public accommodation'" and "[b]ecause Congress has provided

16

that are public accommodations. All of these listed types of locations are tangible, physical places. No intangible places or spaces, such as websites, are listed. Thus, we conclude that, pursuant to the plain language of Title III of the ADA, public accommodations are limited to actual, physical places.[13] Necessarily then, we hold

---

such a comprehensive definition of 'public accommodation,' we think that the intent of Congress is clear enough." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1241 (11th Cir. 2000) (construing the definition of "public accommodation" in Title III). And, to put it plainly, "legislative history is not the law." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (quotation marks omitted). "The language of the statute is entirely clear, and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it." *Conroy v. Aniskoff*, 507 U.S. 511, 528 (1993) (Scalia, J., concurring).

[13] In so holding, we join several of our sister circuits. The Third Circuit held that "[t]the plain meaning of Title III is that a public accommodation is a place." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir. 1998). Similarly, the Sixth Circuit held that "the plaintiffs' argument that the prohibitions of Title III are not solely limited to 'places' of public accommodation contravenes the plain language of the statute." *Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995). Specifically, the hearing-impaired plaintiffs in *Stoutenborough* challenged the National Football League's "blackout rule," which prohibited live broadcast of home football games when the games were not sold out, leaving live radio broadcast as the only alternative. *Id.* at 582. The court held that "[a]lthough a [football] game is played in a 'place of public accommodation' and may be viewed on television in another "place of public accommodation," the "service" of a televised broadcast "does not involve a 'place of accommodation." *Id.*; *see also Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010 (6th Cir. 1997) ("As is evident by § 12187(7), a public accommodation is a physical place."). The Ninth Circuit has also held that under the principle of *noscitur a sociis*, "place of public accommodation" should be interpreted within the context of the accompanying words, which are all "actual, physical places where goods or services are open to the public, and places where the public gets those goods or services." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000).

    We note, however, that, other circuits have disagreed. The First Circuit has determined that that the phrase "public accommodation" "is not limited to actual physical structures." *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994). And in *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999), the Seventh Circuit cited *Carparts* approvingly, writing that "[t]he core meaning of [the public accommodation] provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) . . . that is open to the public cannot exclude disabled persons."

17

that websites are not a place of public accommodation under Title III of the ADA.[14] Therefore, Gil's inability to access and communicate with the website itself is not a violation of Title III.

## 2. Does Winn-Dixie's website otherwise violate Title III?

Our analysis does not end with the conclusion that a website is not a place of public accommodation as Gil does not take the position that websites must be declared places of public accommodation for him to be afforded relief. Instead, he argues that, pursuant to this Circuit's precedent, the ADA forbids not just physical barriers, but also "intangible barriers," that prevent an individual with a disability from fully and equally enjoying the goods, services, privileges, or advantages of a place of public accommodation. Thus, he contends that the website violates Title III because its inaccessibility serves as an intangible barrier to his "equal access to the services, privileges, and advantages of Winn-Dixie's physical stores," which are a place of public accommodation.

As discussed in section one, Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). For purposes of

---

[14] Notably, the dissent does not challenge this holding.

this general discrimination prohibition, discrimination includes instances where a place of public accommodation "fail[s] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *See id.* § 12182(b)(2)(A)(iii). And in *Rendon v. Valleycrest Productions, Ltd.*, we held that the

> plain and unambiguous statutory language . . . reveals that the definition of discrimination provided in Title III covers both tangible barriers, that is physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, *see* 42 U.S.C. § 12182(b)(2)(A)(iv), and *intangible barriers*, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges, *see* 42 U.S.C. § 12182(b)(2)(A)(i)-(ii).

294 F.3d 1279, 1283 (11th Cir. 2002) (emphasis added). We also noted in dicta that "an intangible barrier may result as a consequence of a defendant entity's failure to act, that is, when it refuses to provide a reasonable auxiliary service that would permit the disabled to gain access to or use its goods and services," which would violate 42 U.S.C. § 12182(b)(2)(A)(iii).[15] *Rendon*, 294 F.3d at 1283 n.7. Gil

---

[15] Admittedly, our use of the term "*reasonable* auxiliary service" in *Rendon* was imprecise and did not track the statutory language. To be clear, discrimination under Title III occurs where a place of public accommodation "fail[s] to take such steps as may be *necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services," not where a place of public accommodation simply fails to provide auxiliary services that may be

relies upon this intangible barrier discussion in *Rendon* to argue that, even though Winn-Dixie's website is not itself a place of public accommodation, its inaccessibility to individuals who are visually disabled nevertheless violates Title III because it operates as an "intangible barrier" to accessing the goods, services, privileges, or advantages of Winn-Dixie's physical stores.[16]

But at a fundamental level, Winn-Dixie's limited use website is unlike the intangible barrier asserted in *Rendon*. Specifically, the *Rendon* plaintiffs brought a Title III ADA claim against the production companies of the television game show "Who Wants To Be A Millionaire." 294 F.3d at 1280. The producers of the show conducted contestant selection by using an automated hotline that provided a series of questions. Callers could use their telephone keypads to respond to the questions, and those who answered correctly could proceed through multiple rounds of the selection process and ultimately have a chance of appearing on the show. *Id.* Notably, this hotline was the only method of contestant selection. The *Rendon* plaintiffs' disabilities included lack of hearing and "upper-body mobility

---

"reasonable" to ensure discrimination does not occur. 42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added); *see also* 28 C.F.R. § 36.303(c)(1) ("A public accommodation shall furnish appropriate auxiliary aids and services where *necessary* to ensure effective communication with individuals with disabilities." (emphasis added)); *PGA Tour*, 532 U.S. at 682 (distinguishing in *dicta* between a "reasonable" and a "necessary" ADA modification).

[16] The services or privileges of the place of public accommodation, *i.e.*, Winn-Dixie's physical stores, that are at issue in this case are the ability to refill a prescription and the redemption of coupons.

impairments," such that they "could not register their entries, either because they were deaf and could not hear the questions on the automated system, or because they could not move their fingers rapidly enough to record their answers on their telephone key pads." *Id.* at 1280–81. The system lacked Telecommunications Devices for the Deaf ("TDD") services, which allow deaf people to communicate with each other via text sent from each user's TDD machine, or between a deaf person and a hearing person using a relay operator provided by the telecommunication carrier. *Id.* at 1281 n.1. Accordingly, the plaintiffs alleged that the automated contestant hotline was a discriminatory procedure that screened out disabled hearing-impaired and mobility-impaired individuals who sought to be contestants on the show. *Id.* at 1281. The district court dismissed the complaint, concluding that Title III did not apply to the contestant hotline because it was not administered in a place of public accommodation. *Id.* We reversed on appeal based on our holding that the ADA's discrimination provisions applied not just to physical barriers but also to "intangible barriers." *Id.* at 1283–84. And we concluded that the plaintiffs had "stated a valid claim under Title III by alleging that the . . . telephone selection process is a discriminatory screening mechanism, policy or procedure, which deprives them of the opportunity to compete for the privilege of being a contestant" on the gameshow. *Id.* at 1286.

21

Because the phone system in *Rendon* provided the sole access point for individuals to compete for the privilege of being a contestant on the game show and that same phone system was inaccessible by individuals with certain disabilities, it necessarily acted as an "intangible barrier" that prevented the plaintiffs from "accessing a privilege" of a physical place of public accommodation (the game show). In the case at hand, however, Winn-Dixie's limited use website, although inaccessible by individuals who are visually disabled, does not function as an intangible barrier to an individual with a visual disability accessing the goods, services, privileges, or advantages of Winn-Dixie's physical stores (the operative place of public accommodation). Specifically, Winn-Dixie's website has only limited functionality.[17] Most importantly, it is not a point of sale; all purchases must occur at the store. Further, all interactions with Winn-Dixie which can be (although need not be) initiated on the website must be completed in-store: prescription pick-ups and redemption of coupons. And nothing prevents Gil from shopping at the physical store. In fact, he had done so for many years before he freely chose to stop shopping there. Although Gil was not always happy with the speed or privacy of the service he received at the pharmacy, nothing prevented Gil from refilling his prescriptions during his time as a Winn-

---

[17] At oral argument, Gil agreed that Winn-Dixie is not required to have a website, and that it could simply remove the site.

Dixie customer.[18] And for years, Gil used paper coupons at Winn-Dixie's stores, despite any inconveniences such use entailed. Accordingly, we hold that Winn-Dixie's website does not constitute an "intangible barrier" to Gil's ability to access and enjoy fully and equally "the goods, services, facilities, privileges, advantages, or accommodations of" a place of public accommodation (here, a physical Winn-Dixie store). Consequently, Gil's inability to access the website does not violate Title III of the ADA in this way.

The dissent reaches the opposite conclusion, reasoning that because Gil is not able to access the services or privileges offered on the website, he is therefore "treated differently" than sighted customers because of the absence of an auxiliary aid on the website in violation of 42 U.S.C. § 12182(b)(2)(A)(iii). As the dissent points out, the term "auxiliary aid" refers to a tool or service that ensures "effective communication" with a person who has a hearing, vision, or speech disability and the place of public accommodation. *See* 28 C.F.R. § 36.303(c)(1). Thus, the dissent concludes that Winn-Dixie is in violation of § 12182(b)(2)(A)(iii) because its website is incompatible with screen reader software (an auxiliary aid), which prevents Gil and other visually disabled patrons from accessing the services,

---

[18] We note that at trial, Winn-Dixie's representative testified that new prescriptions could not be submitted and filled through the website. Rather, "the doctor actually has to call [the new prescription] in and then [the customer] ha[s] to pick it up in the store." While presumably customers could also call the pharmacy to request refills of prescriptions in advance of arriving at the physical store, there is nothing in the record to indicate that this option was available.

privileges, and advantages offered on the website which "'improve[s] [the] position or condition' of Winn-Dixie's [sighted] customers." The problem with the dissent's conclusion in this case is that, as we explained above, the website itself is not a place of public accommodation; rather places of public accommodation are limited to actual, physical spaces. Therefore, Gil's mere inability to communicate with and access the services available on the website does not mean that Winn-Dixie necessarily is in violation of 42 U.S.C. § 1282(b)(2)(A)(iii). Rather, in order for there to be a violation of § 12182(b)(2)(A)(iii), the inaccessibility of the website must serve as an "intangible barrier" to Gil's ability to communicate with Winn-Dixie's physical stores, which results in Gil being excluded, denied services, segregated, or otherwise treated differently from other individuals in the physical stores.[19] *See Rendon*, 294 F.3d at 1283–84. And while Gil asserted that he could not "comprehend [Winn-Dixie's] *website* in an effective manner" due to the absence of an auxiliary aid, he never asserted that he was not able to communicate

---

[19] Contrary to the dissent's contention, we do not contend that the ADA limits discrimination solely to conduct that results in a disabled person's physical exclusion from a place of public accommodation. Rather, our only contention is that Title III's requirements are applicable to places of public accommodation, which are only tangible, physical spaces. And, as explained above, this conclusion results from a straightforward application of the cardinal rules of statutory interpretation. We agree with the dissent that our caselaw holds that Title III applies to "intangible barriers" that serve to restrict a disabled individual's ability to access the goods, services, and privileges of a place of public accommodation. *See Rendon*, 294 F.3d at 1283–84. We also agree with the dissent that under § 12182(b)(2)(A)(iii), the ADA may be violated if, in a place of public accommodation, a disabled individual is "excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids," but we disagree that under the unique facts of this case any such exclusion, denial of services, segregation, or otherwise different treatment occurred.

24

effectively with, or access the services offered in, the physical stores. Nor could he, because as explained previously the record clearly establishes that for at least fifteen years, Gil was able to enjoy fully and equally the services in question—filling prescriptions and using coupons—in Winn-Dixie's physical stores. Consequently, there is no basis for concluding that Winn-Dixie violated § 12182(b)(2)(A)(iii).

Gil erroneously assumes in his arguments that *Rendon* established a "nexus" standard, whereby a plaintiff only has to demonstrate that there is a "nexus" between the service and the physical public accommodation. In other words, the gravamen of Gil's argument is that the website is in violation of Title III because it "augments" the physical store's services or privileges in various ways. But we did not adopt or otherwise endorse a "nexus" standard in *Rendon*. Indeed, the only mention of a "nexus" in *Rendon* is a footnote acknowledging that certain precedent from *other* circuits "*[a]t most, . . .* can be read to require a nexus between the challenged service and the premises of the public accommodation." *Id*. at 1284 n.8 (emphasis added). And we decline to adopt a "nexus" standard here, as we find no basis for it in the statute or in our precedent.

While acknowledging that the ADA does not require that places of public accommodation provide identical experiences for disabled and non-disabled patrons, *see A.L. by and through D.L. v. Walt Disney Parks & Resorts US, Inc.*,

25

900 F.3d 1270, 1294–95 (11th Cir. 2018); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017), the dissent argues that the lack of accessibility of the website nevertheless violated the ADA because it failed to provide comparable or "like" experiences to disabled and non-disabled Winn-Dixie customers. Specifically, noting that the ADA does not define what constitutes "goods, services, privileges, or advantages," the dissent invokes a broad definition to conclude that Winn-Dixie's website's content itself (*i.e.*, the prescription refill and coupon-linking tools) constitute a "service," "privilege," and an "advantage" because those tools offer customers the benefit of obtaining goods or services through "a streamlined, faster process that offered greater privacy." Thus, the dissent concludes that because visually disabled individuals cannot access the website's content, they are not receiving a "comparable" or "like" experience to that of sighted customers as required by the ADA. But under such an expansive interpretation, virtually anything—from the tangible to the intangible—might be deemed a "service," "privilege," or "advantage" for purposes of Title III. In turn, the place of public accommodation would then be required to provide "full and equal enjoyment" to not only tangible services—in this case the filling of prescriptions and redemption of coupons—but intangible "privileges" or

26

"advantages" such as increased privacy and time saving benefits.[20] When the text of Title III is read in context and with a view to the overall statutory scheme, it is clear that Title III will not bear such a sweeping interpretation. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 666 (2007) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000))).

Furthermore, any convenience or time saving benefits afforded through the website might make the provision of "auxiliary aids and services" *reasonable* but is not dispositive of whether such "auxiliary aids and services" are in fact

---

[20] The ADA "focus[es] on equal opportunity [for the disabled] to participate in or benefit from the defendant's goods and services," *A.L.*, 900 F.3d at 1295, it does not regulate the content of the goods and services provided by a place of public accommodation and it does not require identical experiences. No one disputes Gil could fill prescriptions in Winn-Dixie's stores and redeem coupons (and he did so for over 15 years). Contrary to the dissent's conclusion, the fact that Gil could not take advantage of the more streamlined, time-saving process of the website's tools to procure these same services does not mean that he was not afforded a "comparable" or "like" experience to that of sighted customers. Gil is at no less of a disadvantage than a sighted customer who does not have internet access and therefore cannot access the streamlined online process. In sum, although the dissent acknowledges that all that the ADA requires of a place of public accommodation is a "like" or "comparable" experience to that of sighted customers, in practice, the dissent advances what the ADA does not mandate—that in order to have "full and equal enjoyment" of Winn-Dixie's physical store's goods and services, visually disabled customers must be afforded a virtually identical experience to that of sighted customers. "But such a reading [of Title III] is plainly unrealistic, and surely unintended, because it makes an unattainable demand." *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000); *see also Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013) (holding that "[u]nder a 'meaningful access' standard, . . . aids and services are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but they nevertheless must afford handicapped persons equal opportunity . . . to gain the same benefit" (quotations omitted)).

"*necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids." *See* 42 U.S.C. § 12182(b)(2)(A)(iii) (providing that discrimination for purposes of 42 U.S.C. § 12182(a) includes "a failure to take such steps as may be *necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids" (emphasis added)). And it is only the latter that places of public accommodation are required to provide pursuant to Title III. *Id.*; *see also PGA Tour*, 532 U.S. at 682 (distinguishing in *dicta* between a "reasonable" and a "necessary" ADA modification and noting that, where a disabled individual is able to participate, even if under "uncomfortable or difficult" conditions, "an accommodation might be reasonable but not necessary").[21] As discussed previously, Gil has not asserted that the absence of

---

[21] Although the Supreme Court's discussion in *PGA Tour* of the difference between a "reasonable" and a "necessary" ADA modification was *dicta*, it is well-established that "there is dicta and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). We, along with our sister circuits, "have previously recognized that 'dicta from the Supreme Court is not something to be lightly cast aside,'" and at a minimum is of considerable persuasive value. *Id.* at 1325–26 (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc) ("[W]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court. Respect for the rule of law demands nothing less: lower courts grappling with complex legal questions . . . must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law." (internal citation omitted)); *United States v. Montero–Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("We do not treat considered dicta from the Supreme Court lightly. Rather, we accord it appropriate deference . . . . As we have frequently acknowledged, Supreme Court dicta have a

auxiliary aids prevents him from effectively communicating with, or accessing the services of, Winn-Dixie's physical stores—the operative place of public accommodation.

Gil and to some extent the dissent urge us to reach the opposite conclusion by following the Ninth Circuit in *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir.), *cert. denied*, 140 S. Ct. 122 (2019), but *Robles* is both factually and legally distinguishable. In *Robles*, the plaintiff, who is blind, was unable to order pizza over the internet from his local Domino's Pizza ("Domino's") because the Domino's app and website were incompatible with his screen reader software. He brought an action under Title III, seeking damages and a permanent injunction requiring Domino's to comply with a specific private industry standard for website accessibility. *Id.* at 902. The district court granted Domino's motion to dismiss, reasoning that although "the ADA's 'auxiliary aids and services' section, 42 U.S.C. § 12182(b)(2)(A)(iii)," applied to the website and app, due process concerns prevented the court from "imposing the [specific private industry] standards on Domino's without specifying a particular level of success criteria and without the DOJ offering meaningful guidance on this topic" because to do so

---

weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding." (quotation omitted)); *Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 120 n.8 (7th Cir. 1989) ("This Court should respect considered Supreme Court dicta.").

would "fl[y] in the face of due process." *Id.* at 903 (quotation omitted). The Ninth Circuit reversed. Noting that it did not have to address whether a website is itself a public accommodation, *id.* at 905 n.6, it explicitly embraced a "nexus" standard: "Customers use the website and app to locate a nearby Domino's restaurant and order pizzas for at-home delivery or in-store pickup. This nexus between Domino's website and app and physical restaurants—which Domino's does not contest—is critical to our analysis." *Id.* at 905. The court went on to find that "the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants."[22] *Id.* at 905–06. The court also disregarded the district court's due process concern, concluding that the plaintiff was not seeking to "impose liability based on [the private industry standard]," but rather based on the more general statutory provisions of Title III of the ADA and its related regulations. *Id.* at 907. The court reasoned that compliance with the private industry standard was simply an equitable remedy that the district court had the power to impose for a Title III violation. *Id.* at 907–09.

While the underlying general difficulty for the plaintiff in *Robles*—the incompatibility of Domino's website and app with the plaintiff's screen reader

---

[22] In its conclusion, the court expressed "no opinion about whether Domino's website or app comply with the ADA," leaving it "to the district court, after discovery, to decide in the first instance whether Domino's website and app provide the blind with effective communication and full and equal enjoyment of its products and services as the ADA mandates." *Robles*, 913 F.3d at 911.

software—is similar to Gil's frustrations with Winn-Dixie's website, the particular facts of *Robles* are distinctly and materially different from the facts of this case. Domino's made pizza sales through its website and app; here, Winn-Dixie makes no sales of its products on its site. *Compare Robles*, 913 F.3d at 902, *with Gil*, 257 F. Supp. 3d at 1345. The *Robles* plaintiffs complained they were denied access to the goods and services of the physical stores through the website. In contrast, in this case, Winn-Dixie's website does not provide any direct sales of goods or services or impede access to the goods and services offered in the physical stores. Moreover, the application of the "nexus" standard was "critical" to the *Robles*'s court's holding, but as explained above, we decline to adopt the "nexus" standard. In sum, we do not find *Robles* persuasive, either factually or legally. Instead, we apply the statute, 42 U.S.C. §§ 12182(a) and (b)(2)(A)(iii), and our precedent, *see Rendon*, 294 F.3d at 1283, to the facts before us, and we hold that the absence of auxiliary aids on Winn-Dixie's website does not act as an intangible barrier that results in Gil being discriminatorily "excluded, denied services, segregated or otherwise treated differently than other individuals" in the physical stores—the operative place of public accommodation—because of the absence of auxiliary aids and services as contemplated by the ADA. 42 U.S.C. § 12182(b)(2)(A)(iii). Rather, we conclude that, on the facts of this case, Gil is able to enjoy fully and equally "the goods, services, facilities, privileges, advantages, or accommodations

31

of" Winn-Dixie's physical stores as contemplated by Title III of the ADA. *Id.* § 12182(a).

### III.

There is no doubt that Congress enumerated a broad spectrum of public accommodations when it enacted Title III of the ADA. There is similarly no doubt that a commendable purpose of the ADA was reflected in its title: to enhance the lives of Americans with disabilities by requiring certain accommodations for them. We also recognize that for many Americans like Gil, inaccessibility online can be a significant inconvenience. But constitutional separation of powers principles demand that the details concerning whether and how these difficulties should be resolved is a project best left to Congress. "[O]ur constitutional structure does not permit this Court to 'rewrite the statute that Congress has enacted.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016) (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005)). Absent congressional action that broadens the definition of "places of public accommodation" to include websites, we cannot extend ADA liability to the facts presented to us here, where there is no barrier to the access demanded by the statute. We therefore vacate the district court's Final Judgment and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

JILL PRYOR, Circuit Judge, dissenting:

In this appeal we consider whether the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, is violated when a place of public accommodation, here, a store, offers valuable in-store benefits to customers through a website that is inaccessible to individuals with visual disabilities. Defendant Winn-Dixie Stores, Inc. operates grocery stores, some of which offer pharmacy services. To enhance its customers' shopping experience, Winn-Dixie provided a website that enabled customers to, among other things, obtain express prescription refills with greater privacy and more conveniently benefit from discount offers by linking manufacturers' coupons electronically to their Winn-Dixie customer rewards cards. Winn-Dixie's customers could obtain the in-store prescription and coupon benefits only by accessing Winn-Dixie's website.

But visually-impaired customers could not access the website. The website was incompatible with screen-reading technology that would enable them to use it. Winn-Dixie's visually-impaired customers therefore were treated differently than its sighted customers and denied the full and equal enjoyment of services, privileges, and advantages offered by Winn-Dixie stores. I would hold that this inferior treatment amounted to disability discrimination by the operator of a place of public accommodation under Title III of the ADA.

33

Title III prohibits operators of places of public accommodation, like Winn-Dixie, from engaging in discrimination that deprives disabled individuals of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Discrimination prohibited by the ADA includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated[,] or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* § 12182(b)(2)(A)(iii). Under this provision, an operator of a place of public accommodation "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

Winn-Dixie does not dispute that it failed to provide an auxiliary aid when it refused to make its website compatible with screen-reading technology. As a result, visually-impaired individuals could not access the website. And Winn-Dixie provided no alternative way for them to request express prescription refills or digitally link coupons to their rewards cards so that discounts could be applied seamlessly at checkout—privileges and advantages that sighted customers enjoyed. That conduct amounted to discrimination under § 12182(b)(2)(A)(iii) and was therefore prohibited by § 12182(a).

34

The majority opinion concludes that Winn-Dixie did not violate the ADA because visually-impaired customers remained able to shop in Winn-Dixie stores, where they could request prescription refills and manually redeem coupons. That conclusion is premised on the majority opinion's misunderstanding of the ADA's scope. The ADA's guarantee of freedom from discrimination for disabled individuals is broad: It prohibits places of public accommodation from denying them "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). It protects disabled individuals not only from "exclu[sion], deni[al] [of] services, and segregat[ion]," but also from being "treated differently." *Id.* § 12182(b)(2)(A)(iii). Winn-Dixie's discriminatory conduct "treated [visually-disabled individuals] differently," denying them the full and equal enjoyment of its stores' "services," "privileges," and "advantages"—namely, the more favorable treatment Winn-Dixie afforded to sighted customers, who could request express prescription refills or link manufacturers' digital coupons to their rewards cards through the website before going to the store to shop. I would hold that in failing to make its website accessible, Winn-Dixie violated the ADA. I dissent.[1]

---

[1] I am not arguing that the website in and of itself was a place of public accommodation under the ADA, but I disagree with the majority opinion's decision to fashion new circuit law on that issue, an issue on which the circuits are split. *See* Maj. Op. at 17 n.13 (explaining that it is taking a position in an existing circuit split). As the majority opinion acknowledges, the district

I.

Plaintiff Juan Carlos Gil is a long-time Winn-Dixie shopper who is legally blind. While in high school, Gil visited a Winn-Dixie grocery store as part of a class project, discovered that Winn-Dixie offered the lowest prices on groceries, and became a loyal Winn-Dixie customer. For more than 15 years, Gil bought his groceries at Winn-Dixie stores and filled his prescriptions there.

When Gil wanted to refill a prescription at Winn-Dixie, he went to the store, asked for employee assistance, walked with the employee to the pharmacy area, and told the pharmacist what he needed. The process would take 20 to 30 minutes. Its inherent lack of privacy made Gil "uncomfortable because he did not know who

_____

court "twice declined to reach the issue," *id.* at 12 n.8, and Gil did not "plainly and prominently" present it in his brief on appeal. *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 821 n.4 (11th Cir. 2020) ("Although an appellee may urge us to affirm on any basis supported by the record," he abandons a position when he "does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims." (internal quotation marks omitted)); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318–19 (11th Cir. 2012) (concluding that issue was waived when appellee mentioned it only in passing). Moreover, Gil flatly denied that he was raising the issue when asked about it at oral argument.

We generally do not consider—just to reject—arguments that appellees could have raised on appeal to defend a district court's judgment when those arguments are not presented to us. *See Hamilton*, 680 F.3d at 1319. This restraint "promotes careful and correct decision making[,]" "gives the appellate court the benefit of written arguments[,] and provides the court and the parties with an opportunity to prepare for oral argument with the opposing positions and arguments in mind." *Id.* Particularly given the circuit split, I disagree with the majority's decision to rule, without the benefit of adversarial argument, on whether websites can ever be places of public accommodation under the ADA because "[where] it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. Drug Enf't Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring).

36

else was nearby listening" as he asked the pharmacist to refill his prescriptions. Doc. 63 at 3.[2]

When Gil, who had a low income, bought groceries at Winn-Dixie, he sometimes used coupons to take advantage of promotions. Taking advantage of those promotions required him to ask friends to read the coupons to him from a newspaper or request the help of Winn-Dixie employees. Employees were sometimes "annoyed by his request for help." *Id.*

Eventually, Gil learned that Winn-Dixie operated a website that enabled customers to, among other things, request prescription refills before coming to the store and link digital coupons to their customer rewards cards so that discounts were applied automatically at checkout. Through the website's prescription feature, customers could, in the privacy of their own homes, request refills in advance and then pick up their medication at the store when it was ready.[3] They could also transfer a prescription to be filled at a different Winn-Dixie store. Winn-Dixie described the online refill order feature as allowing customers to obtain "express re-fill[s]" of their prescriptions. Doc. 65 at 87. Gil sought to use

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] The prescription refill request tool, as well as the other tools on Winn-Dixie's website that are relevant to this appeal, was operated by a third-party. This fact does not affect the analysis. Winn-Dixie seamlessly incorporated these tools into its website to offer benefits to its customers. And, with respect to liability under the ADA, the parties do not place any significance on the fact that a third party, instead of Winn-Dixie, actually operated the tools.

this feature because it would afford him greater independence, convenience, and privacy, by allowing him to obtain prescription refills without having to disclose his medical information where others could overhear.

Through the website's coupon feature, customers could click on manufacturers' coupons displayed on the website to link the coupons to their customer rewards cards. Then, when the customer shopped and scanned his rewards card, the coupon discount was applied automatically to his order. Winn-Dixie accepted manufacturers' coupons in stores, the website tool was the only way a customer could link a coupon to his rewards card for automatic application at checkout. Gil, who had a rewards card, was interested in using this feature because it would give him greater independence by making it possible for him to find and use coupons without having to ask friends or store employees for help.

Gil also sought to use the website's store locator feature, which allowed its nondisabled customers to discover the location of Winn-Dixie's 495 stores that are spread throughout the southeastern United States. As a para-Olympian, Gil frequently travels across Florida. When he travels, he brings his laptop, which is equipped with screen-reading software, so he can locate and patronize nearby businesses. When a business's store locator feature is accessible to Gil, he can discover which of that business's physical stores he would like to patronize; when it is not so accessible, he can use a third party's store locator service that is

38

accessible to him to accomplish that end. But it is faster for him to use the website of the store he wishes to patronize than to leave the website to use a search engine provided by a third party.

Eager to take advantage of the prescription and coupon benefits provided by the website and its store locator feature, Gil used his computer to try to access Winn-Dixie's website. Because he is blind, when using a computer Gil relies on screen-reading software, which vocalizes visual information found on the computer screen. With this software, Gil has successfully used more than 500 websites. The software could not read Winn-Dixie's website, however; as a result, approximately 90% of the website was inaccessible to him. Because the website was inaccessible to him, Gil was unable to request prescription refills online in advance, digitally link coupons to his rewards card, or use the website's store locator feature. Frustrated that Winn-Dixie had not made its website accessible to visually-impaired customers, Gil stopped shopping at Winn-Dixie and switched to another pharmacy to fill his prescriptions.

Gil sued Winn-Dixie, alleging that its failure to make its website accessible to visually-impaired customers violated the ADA. He sought an injunction requiring Winn-Dixie to modify its website so that it could be used by visually-impaired individuals.

39

The case proceeded to a bench trial.  At trial, Gil contended that Winn-Dixie engaged in disability discrimination by failing to make its website compatible with screen-reading technology and thus denying visually-impaired individuals the ability to request advance in-store prescription refills, link coupons to their customer rewards cards, and access the website's store locator.

Post-trial, the district court ruled that Winn-Dixie had engaged in disability discrimination under the ADA.  The court found that visually-impaired individuals could not access Winn-Dixie's website because it was incompatible with screen-reading technology.  This incompatibility, the district court found, meant that Winn-Dixie, through its website, offered features and services to the general public that were inaccessible to Gil, including an "online pharmacy management system," "the ability to access digital coupons that link automatically to a customer's rewards card," and a store locator.  Doc. 63 at 10.[4]

In its conclusions of law, the district court addressed the types of conduct that constitute discrimination under the ADA.  The court pointed to the ADA's broad statutory language prohibiting discrimination in "the full and equal

---

[4] The district court found that Gil was "credible and forthcoming" and that there were "virtually no disputes in the testimony and evidence." Doc. 63 at 1–2. The majority opinion does not challenge the district court's factual findings, which we may overturn only if clearly erroneous. Fed. R. Civ. P. 52(a)(6). The district court's credibility findings demand particularly great deference because only the district court had the opportunity to observe Gil's demeanor as he was testifying. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

40

enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." *Id.* at 8 (quoting 42 U.S.C. § 12182(a)). Given the breadth of this language, the district court concluded, the ADA did more than "merely require" that individuals with disabilities receive "physical access to a place of public accommodation." *Id.* at 10. In arriving at this conclusion, the district court also relied on our precedent holding that the ADA prohibited "intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures[,] that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges." *Id.* at 9 (quoting *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1283 (11th Cir. 2002)).

Applying the law to its findings of fact, the district court concluded that Winn-Dixie had discriminated against persons with visual disabilities by failing to make its website compatible with screen-reading software. Because Winn-Dixie's visually-impaired customers were unable to submit advance prescription refills for in-store pickup, easily locate and link digital coupons to their customer rewards cards so that discounts would be applied automatically at checkout, and access the store locator, the district court concluded that Winn-Dixie had denied them "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations that Winn-Dixie offer[ed] to its sighted customers." Doc. 63

41

at 10. To remedy this violation, the district court entered a permanent injunction requiring Winn-Dixie to make its website accessible to visually-impaired individuals and to ensure that the website complied with established guidelines governing website accessibility.

## II.

## A.

After "decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities," Congress "invok[ed] the 'sweep of congressional authority'" to pass the ADA. *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(b)(4)). Following a thorough investigation, Congress engraved its findings into the ADA's text. *See* 42 U.S.C. § 12101(a)(1)–(8). As the Supreme Court has recognized, those findings have served a "critical[]" role in judicial construction of the Act's scope. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 484 (1999), *abrogated on other grounds by* ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008).

Specifically, Congress found that individuals with disabilities "continually encounter various forms of discrimination, including . . . communication barriers, . . . failure to make modifications to existing facilities and practices, . . . and relegation to lesser services, programs, activities, benefits, jobs, or other

42

opportunities." 42 U.S.C. § 12101(a)(5). Given that finding, Congress announced that "the Nation's proper goals" regarding individuals with disabilities are to ensure "full participation, independent living, and economic self-sufficiency for such individuals." *Id.* § 12101(a)(7). To effectuate these broad remedial goals, the ADA prohibits discrimination in major areas of public life, including employment (Title I), public services (Title II), and public accommodations (Title III). *See Lane*, 541 U.S. at 516–17.

Our focus today is on Title III, which bars discrimination by operators of places of public accommodation. Title III sets forth a "[g]eneral rule," language by now familiar to the reader: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who . . . operates a place of public accommodation." 42 U.S.C. § 12182(a). To clarify that rule's scope, Title III also sets forth "[g]eneral prohibition[s]," *see id.* § 12182(b)(1), and "[s]pecific prohibitions," *see id.* § 12182(b)(2).

The specific prohibitions provide a non-exhaustive list of "examples of actions or omissions that constitute [prohibited] discrimination." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1292 (11th Cir. 2018); *see* 42 U.S.C. § 12182(b)(2). One of the specific prohibitions deems it

43

discriminatory for a place of public accommodation to "fail[] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated[,] or otherwise treated differently than other individuals because of the absence of auxiliary aids and services," unless the entity demonstrates that taking such steps would "fundamentally alter the nature" of the service, privilege, or advantage offered or "result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii).

In my view, it is clear from that specific prohibition and § 12182(a)'s general rule that Winn-Dixie violated the ADA. So, there is no need to consider whether Winn-Dixie's conduct also ran afoul of § 12182(b)'s other specific prohibitions or its general prohibitions.

### B.

I would hold that Winn-Dixie's failure to make its website accessible to visually-impaired individuals is discriminatory under § 12182(b)(2)(A)(iii) and thus prohibited by § 12182(a). I begin with what is undisputed. First, Gil's disability qualifies for protection under the ADA. Second, Winn-Dixie's physical stores are public accommodations under the ADA. *See* 42 U.S.C. § 12181(7) (including "grocery store[s]" and "pharmac[ies]" whose operations "affect commerce" within the definition of "public accommodation"). Third, the technology that integrates a website with the screen-reading software Gil uses

44

qualifies as an "auxiliary aid[] and service[]" under the ADA. *See* 28 C.F.R. § 36.303 (providing that "screen[-]read[ing] software," "accessible electronic and information technology," and "other effective methods of making visually delivered materials available to [visually-impaired] individuals" are "[e]xamples" of auxiliary aids and services). Fourth, Winn-Dixie does not challenge the district court's finding that Gil and other visually-impaired individuals could not access Winn-Dixie's website or enjoy, by any other means, the three features of Winn-Dixie's website that are relevant to this appeal. Fifth, Winn-Dixie does not argue that making its website accessible to visually-impaired individuals would "fundamentally alter the nature of [its offerings]" or "result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii).

Given this common ground, whether Winn-Dixie violated the ADA turns on whether it was "necessary" for Winn-Dixie to make its website accessible to visually-impaired individuals to ensure they were not "denied services, segregated[,] or otherwise treated differently than [sighted] individuals" in deprivation of their right to the "full and equal enjoyment of the goods, services, . . . privileges, [or] advantages . . . of [Winn-Dixie's stores]." *Id.* § 12182(a), (b)(2)(A)(iii). In my view, the answer is yes, and it follows from our precedent.

To determine whether an accommodation is "necessary" under § 12182(b)(2)(A), we consider "how the[] [public accommodation's offerings] are

45

used by nondisabled [customers]" and then ask whether the operator of the public accommodation has provided its disabled customers with a "like experience and equal enjoyment." *A.L.*, 900 F.3d at 1296 (vacating in part grant of summary judgment because a factual dispute existed as to whether a theme park's program creating a tailored experience for disabled patrons offered an experience comparable to the experience offered to nondisabled patrons). If the operator of a public accommodation has failed to provide disabled customers with "an experience comparable to that of [nondisabled customers]," then an accommodation is necessary. *Id.* at 1294 (quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012));[5] *see also Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1133 (9th Cir. 2003) (concluding that an accommodation was necessary when a movie theater, which offered seating to wheelchair-bound patrons in the front row only, failed to afford these patrons a viewing experience comparable to that offered to nondisabled patrons by denying them access to "comfortable viewing locations").

## C.

Under the standard established in *A.L.*, an accommodation was necessary because Winn-Dixie failed to provide its disabled customers with an experience

---

[5] In *A.L.* we adopted the Ninth Circuit's approach in *Baughman*. *See A.L.*, 900 F.3d at 1296.

comparable to the one it provided nondisabled customers.  *A.L.* requires us to compare Winn-Dixie's treatment of sighted customers—who were able to obtain express prescription refills, link coupons electronically to their rewards cards, and use the store locator feature—with its treatment of visually-impaired customers, who could not use those features.  *See* 900 F.3d. at 1296.  So, let us compare.

First, consider the experience of refilling prescriptions for visually-impaired customers versus that of sighted customers.  Visually-impaired customers had to request prescription refills inside Winn-Dixie stores.  The customer had to go to the store and wait in line to speak to a pharmacist.  After waiting in line, the customer may (like Gil) have had to verbally request his medication by name in a public setting where other customers might overhear.  Once the refill was requested, the pharmacy had to take certain steps required by state law before dispensing the prescription.  For example, under Florida law (which governed the Winn-Dixie pharmacies that Gil patronized) pharmacists were required to verify that the prescription authorized a refill, consider whether the prescription medication could cause a potential adverse reaction or an interaction with other medications the customer was taking, and ensure that the appropriate dose and quantity were provided.[6]  In addition, pharmacy employees had to determine

---

[6] *See, e.g.*, Fla. Admin. Code Ann. r. 64B16-27.211 (limiting the number of times a pharmacist can refill a particular prescription);  Fla. Stat. § 465.003(6) (requiring that before a

whether the customer had a prescription drug benefit plan that covered the refill

and how much the customer should be charged.  According to unrefuted evidence

in the record, customers (like Gil) who requested refills in Winn-Dixie's store

might wait 20 to 30 minutes until the refill was ready.

By contrast, a sighted customer who submitted an online prescription refill

request through Winn-Dixie's website was offered a streamlined, faster process

that offered greater privacy.  As to privacy, when a customer initiated a

prescription refill in the store, she may have had to verbally request the refill.  As

Gil explained, this process made him "very uncomfortable" because others

potentially could overhear him discussing his health conditions and medication

needs with pharmacy employees.  Doc. 65 at 44.  Sighted customers could avoid

verbally requesting their refill by using Winn-Dixie's website.[7]

As to time saved, a customer requesting her refill online benefitted from the

pharmacist checking her insurance coverage, verifying that the prescription and

refill were authorized, and preparing the prescription before her arrival.  Upon

arrival, the medication was ready for pickup.  Indeed, Winn-Dixie touted the time

pharmacist dispenses a drug she must "interpret and assess the prescription order for potential adverse reactions [and] interactions"); Fla. Admin Code Ann. r. 64B16-27.1001(3), (4) (setting forth a pharmacist's responsibilities when filling a prescription).

[7] This privacy concern is particularly acute for visually-impaired customers, who may be less able than sighted customers to determine whether bystanders are close enough to overhear them.

savings that online customers enjoyed, advertising that its website gave customers access to "*express* re-fill[s]." Doc. 65 at 87 (emphasis added).

As the majority concedes, "nothing in the record" suggests that Winn-Dixie offered customers any means *other than its website* to request prescription refills "in advance of arriving at the physical store." Maj. Op. at 23 n.18. After comparing the experiences of Winn-Dixie's disabled and nondisabled customers regarding express prescription refills, I cannot understand how the majority concludes that disabled customers, like Gil, were offered the equal treatment and "like experience" that *A.L.* requires. 900 F.3d at 1296–98.[8]

Second, consider the coupon experience for visually-impaired customers versus that of sighted customers. When a store accepts manufacturers' coupons, it allows its customers to take advantage of discounts on the products they purchase. A visually-impaired customer who wanted to use manufacturers' coupons to

---

[8] To support its conclusion that there was no ADA violation here because an accessible website was not "necessary" within the meaning of § 12182(b)(2)(A)(iii), the majority opinion does not discuss *A.L.*, our authoritative precedent on the matter, and instead relies on what the majority concedes is "dicta" from *PGA Tour*. Maj. Op. at 29. That dicta explains that an accommodation's necessity "might" depend on whether the plaintiff could "uncomfortabl[y]" enjoy the public accommodation's offerings or whether such enjoyment was "beyond [his] capacity." *PGA Tour*, 532 U.S. at 682. The majority opinion suggests that this dicta supports the proposition that an accommodation was not necessary in this case because Gil was "able to participate [in Winn-Dixie's services, privileges, and advantages], even if under 'uncomfortable or difficult' conditions." Maj. Op. at 29 (quoting *PGA Tour*, 532 U.S. at 682). But whether it was merely "uncomfortable" for Gil to enjoy Winn-Dixie's offerings or whether such enjoyment was "beyond [his] capacity" turns on how we conceptualize those offerings. As I explain later, the majority opinion's conception of Winn-Dixie's offerings under the ADA is incorrect. The *PGA Tour* dicta cited by the majority opinion therefore gives it no refuge.

purchase items at a Winn-Dixie store had to page through a newspaper, magazine, or other print source to find coupons for products he wanted to purchase, clip the coupons, bring them to the store, and present them to a cashier at checkout—needing to ask for the help of another when he could not perform these tasks himself.

By contrast, Winn-Dixie's website offered sighted customers an improved and more convenient way to use coupons that was available by no other means. A sighted customer could visit the website, which centralized manufacturers' coupons, and digitally link the desired coupons to his account. Then, when he scanned his customer rewards card at checkout, the coupon discounts were applied automatically to his order. There can be no doubt that, with its coupon-linking tool, available only to those who could use Winn-Dixie's website, Winn-Dixie failed to offer like treatment to its disabled and nondisabled customers. Rather, it privileged nondisabled customers, offering them a more convenient and effective way to obtain discounts inside Winn-Dixie stores.

Third, consider the store locator experience for visually-impaired customers. On Winn-Dixie's website, sighted customers could use the store locator feature to navigate virtually among the hundreds of Winn-Dixie stores to determine which location would be most convenient for them to patronize. Typically, a store locator feature not only helps customers get to stores but also informs them of the stores'

50

hours, contact information, and specific services offered. Winn-Dixie's store locator was inaccessible to those with visual impairments. When a website's store locator feature is inaccessible to visually-impaired customers, they must gather the information provided by the feature elsewhere. Undisputed evidence in the record established that it would be more cumbersome for Gil to gather the information provided by the website's store locator from a third party's website. Toggling between multiple websites is more difficult for individuals relying on screen-reading software than it is for sighted individuals. This Court, albeit in an unpublished opinion, has already concluded that a place of public accommodation discriminates within the meaning of § 12182(b)(2)(A)(iii) when it offers a store locator feature on its website that is inaccessible to visually-impaired customers. *See Haynes v. Dunkin' Donuts LLC*, 741 Fed. App'x. 752, 753–54 (11th Cir. 2018) (unpublished). I agree with *Haynes*.

To be sure, the ADA does not require that places of public accommodation provide identical experiences for disabled and nondisabled patrons. *See A.L.*, 900 F.3d at 1294–95. But by offering inferior treatment to its visually-impaired customers with respect to prescription refills, digital coupons, and its store locator, Winn-Dixie failed to provide them with an "experience comparable to that of" its sighted customers. *Id.* at 1294 (internal quotation marks omitted); *see also* 42 U.S.C. § 12182(b)(2)(A)(iii) (requiring that disabled individuals are not "excluded,

51

denied services, segregated[,] or *otherwise treated differently* than other individuals because of the absence of auxiliary aids") (emphasis added).  Because of that failure, it was "necessary" for Winn-Dixie to provide an accommodation unless providing such an accommodation would "fundamentally alter the nature of [Winn-Dixie's offerings]" or result in an "undue burden."  42 U.S.C. § 12182(b)(2)(A)(iii).  As I have explained, Winn-Dixie neither provided an accommodation nor argued that providing such an accommodation would "fundamentally alter" its offerings or result in an "undue burden."  Its failure to make its website accessible to visually-impaired customers thus was discrimination under § 12182(b)(2)(A)(iii) that is barred by § 12182(a).

## III.

The majority opinion resists this conclusion with three arguments.  First, it argues that Gil was not discriminated against "in the full and equal enjoyment" of Winn-Dixie's services, privileges, and advantages because Gil was able to enter Winn-Dixie's stores, refill prescriptions, and use coupons.  Second, it argues that caselaw suggests an intangible barrier to a public accommodation's offerings (like the website's incompatibility with Gil's screen-reading software) violates the ADA only when that barrier prevents disabled individuals from entering the public accommodation's sole access point or accessing one of its points of sale.  Third, it argues that Winn-Dixie's failure to provide a website accessible to visually-

impaired individuals did not constitute discrimination under § 12182(b)(2)(A)(iii) because Gil was prevented from effectively communicating only with Winn-Dixie's website, not its physical stores. Each of these arguments is unpersuasive. I address them in turn.

## A.

First, the majority opinion contends that Winn-Dixie did not violate § 12182(a) because "Gil [was] able to enjoy fully and equally 'the goods, services, facilities, privileges, advantages, or accommodations of' Winn-Dixie's physical stores." Maj. Op. at 33 (quoting 42 U.S.C. § 12182(a)). To arrive at this conclusion, the majority asserts, as it must, that under the ADA the only relevant services, privileges, or advantages Winn-Dixie offered were "the ability to refill a prescription" and "[redeem] coupons." *Id.* at 20 n.16. After positing that the only relevant services, privileges, or advantages offered by Winn-Dixie are "filling prescriptions and using coupons," the majority opinion concludes that "Gil was able to enjoy fully and equally [those] services" and therefore Winn-Dixie did not violate the ADA. *Id.* at 26; *see also id.* at 23 (asserting that because "nothing prevent[ed] Gil from shopping at [Winn-Dixie's] physical store[s]," "refilling his prescriptions," or "us[ing] paper coupons," Gil was not denied full and equal access to Winn-Dixie's services, privileges, or advantages).

53

This argument is doubly flawed.  Its premise—that, for ADA purposes, the relevant services, privileges, and advantages offered by Winn-Dixie were limited to "filling prescriptions and using coupons"—is wrong.  And even if that premise were correct, the majority opinion's conclusion does not follow from it.  For even if the majority is correct that the relevant services, privileges, or advantages were "filling prescriptions and using coupons," Gil was not "able to enjoy fully and equally [those] services," *id.* at 26, because he could enjoy only different—and markedly inferior—versions of them.  I first explain why the majority opinion's conception of what constitutes a service, privilege, and advantage under the ADA contradicts the Act's plain text.  Then, I show why, even under the majority opinion's understanding of those terms, its conclusion does not follow.[9]

The ADA prohibits discrimination "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).  The meaning of this provision is a question of statutory interpretation.  "As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear."  *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en

---

[9] In responding to the majority opinion's arguments, I will not discuss the store locator feature because the majority opinion does not discuss it.  But the same reasons that explain why the website's express prescription refill and coupon-linking features are "services," "privileges," or "advantages" within the meaning of the ADA apply also to the store locator feature.

banc).  "In construing a statute we must begin, and often should end as well, with the language of the statute itself." *Id.* (internal quotation marks omitted).  The ADA does not define the terms "services," "privileges," or "advantages," so we "look to the common usage of [these] words for their meaning." *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018) (internal quotation marks omitted).

To determine the common usage and ordinary meaning of terms, we look to dictionary definitions for guidance. *Id.*  The dictionary definition of "service" is "useful labor that does not produce a tangible commodity." *Service*, Webster's New International Dictionary (3d ed. 1961).[10]  A "privilege" is "a right . . . granted as a peculiar benefit, advantage, or favor." *Privilege*, Webster's New International Dictionary (3d ed. 1961).  And an "advantage" is "a more favorable or improved position or condition." *Advantage*, Webster's New International Dictionary (3d ed. 1961).

Under these definitions, Winn-Dixie offered "services," "privileges," and "advantages" when it empowered customers to request express prescription refills and link coupons to their rewards cards on its website.  Winn-Dixie's prescription offering, by which its customers could pick up prescription refills they had

---

[10] Although it appears that the current meaning of these terms is not much different, here I use dictionary definitions that were current in 1990 when the ADA was passed by Congress and signed by the President.

55

requested in advance online, was a service. In common parlance, a service is provided when a customer requests a service provider to perform an activity, the service provider performs that activity, and the customer pays the service provider. For Winn-Dixie's customers who used the online prescription refill tool, a critical step in that process—the requesting of the service—occurred online. Thus, it makes no sense for the majority opinion to conceive of Winn-Dixie's prescription service as completely untethered from the website.

Even more clearly perhaps, the prescription refill and coupon-linking tools are "privileges" or "advantages." As the comparison above demonstrates, ordering express prescription refills from the privacy of one's home and using the coupon-linking tool to more conveniently take advantage of discounts "benefit[s]" and "improve[s] [the] position or condition" of Winn-Dixie's customers. That is, after all, precisely why Winn-Dixie provided its customers with those features.

The majority opinion does not contest my understanding of the plain meanings of the terms "service," "privilege," and "advantage." Rather, it argues that under my interpretation "virtually anything . . . might be deemed a 'service,' 'privilege' or 'advantage' for purposes of Title III" and thus ADA liability would extend beyond Congress's intent. Maj. Op. at 28. The majority opinion tells us that, when viewed "in context and with a view to the overall statutory scheme, it is clear that Title III will not bear [my] sweeping interpretation." *Id.* But it does not

56

tell us what contextual or structural clues in the ADA the majority opinion has discovered that warrant casting aside the ordinary meaning of § 12182(a)'s terms.

Indeed, looking beyond the terms "services," "privileges," and "advantages" only further demands adherence to those terms' plain meanings. At the micro level, § 12182(a) clarifies that it not only bars discrimination occurring "in" places of public accommodation; it also bars discrimination in the "goods, services, facilities, privileges, advantages, or accommodations" offered *by* places of public accommodation, like Winn-Dixie stores. 42 U.S.C. § 12182(a) (barring discrimination in full and equal enjoyment of the "privileges[] or advantages . . . *of* any place of public accommodation") (emphasis added); *see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019) ("[Section 12182(b)(2)(A)(iii)] applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation"); *id.* at 905–06 & n.6 (holding that § 12182(b)(2)(A)(iii)'s auxiliary aid requirement applies to websites when their inaccessibility impedes access to a physical location's services, "even though customers predominantly access [websites] away from [places of public accommodation]"). Winn-Dixie's express prescription refill service, by which customers could order refills to be picked up at a specific Winn-Dixie location, is unquestionably a privilege or advantage "of" that location.

57

At the macro level, the ADA's text demonstrates that Congress's intent in passing the statute was to comprehensively eradicate disability discrimination, *see* § 12101(b)(1), to ensure "full participation, independent living, and economic self-sufficiency" for Americans with disabilities.  42 U.S.C. § 12101(a)(7).  Congress effectuated the ADA's "broad mandate," "comprehensive character," and "sweeping purpose," *see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (internal quotation marks omitted), by prohibiting at least eight different forms of discrimination, *see* § 12182(b), "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. §12182(a).  The ADA is a sweeping piece of legislation; it is hardly surprising that its terms prohibiting discrimination are broad and inclusive.  To interpret them otherwise offends not only the principle that we should interpret terms according to their ordinary meaning, but also the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. U.S.*, 139 S. Ct. 2116, 2126 (2019) (internal quotation marks omitted).

Because the ability to request express prescription refills and electronically link coupons to one's rewards card via the website was a "service," "privilege," and "advantage" offered by Winn-Dixie's stores, the majority opinion errs in concluding that Gil could "enjoy fully and equally" Winn-Dixie's offerings

58

because he could refill his prescriptions and use coupons at Winn-Dixie's stores. Maj. Op. at 33.  In effect, the majority opinion's conception of Winn-Dixie's offerings distorts the meaning of "services" under the Act and strikes the words "privileges" and "advantages" from it altogether, nullifying Congress's decision to bar discrimination not only relating to "goods, services, [and] facilities" but also that relating to "privileges [and] advantages."  42 U.S.C. § 12182(a).[11]

For these reasons, the majority opinion's constricted conception of Winn-Dixie's offerings contradicts the ADA's text.  But even if the majority opinion were correct that the only services, privileges, or advantages Winn-Dixie offered were its in-store prescription and coupon services, it would still be wrong to conclude that "Gil was able to enjoy fully and equally" those services.  Maj. Op. at 33.  Gil's enjoyment of Winn-Dixie's in-store prescription and coupon services was not full and equal but partial and lesser.  While Winn-Dixie's sighted customers received greater privacy protections and were relieved of the need to

---

[11] The majority opinion's concern that my interpretation of the words "service," "privilege," and "advantage" is too "sweeping"—and will therefore expand § 12182 liability too far—is misplaced for another reason as well.  *See* Maj. Op. at 28–29.  Congress expressly included safeguards in § 12182(b)(2)(A)(iii) to protect operators of public accommodations from liability when accommodating disabled individuals is too onerous:  when accommodations would "fundamentally alter the nature of the [offering]" or "result in an undue burden."  42 U.S.C. § 12182(b)(2)(A)(iii).  As I noted, these exceptions to liability are not implicated here because Winn-Dixie has not argued that either of them applies.  Thus, the majority opinion errs by distorting the plain meaning of the terms "service," "privilege," and "advantage" based on a fear of overextending Title III liability even though Congress addressed that concern by including these exceptions.

wait in-store for pharmacists to refill their prescriptions, Gil had to verbally request prescription refills in-store and endure extended wait times. While Winn-Dixie's sighted customers could collect coupons online and redeem them instantly at checkout, Gil was left to find and assemble physical coupons and present them by hand. As a result of his disability and Winn-Dixie's inaccessible website, Gil received inferior prescription and coupon services from Winn-Dixie. The ADA bars precisely that result. *See* 42 U.S.C. § 12182(a); *see also id.* § 12101(a)(5) (expressing Congress's intent to end the "relegation [of Americans with disabilities] to lesser services").[12]

B.

---

[12] The majority opinion points out that Winn-Dixie is "not required to have a website, and that it could simply remove the [web]site." Maj. Op. 23 n.17. True, but irrelevant. Federal antidiscrimination laws typically do not require public accommodations to provide goods, services, or privileges. Instead, those laws decree that, if such offerings are provided, they may not be provided in a discriminatory manner. For example, the Civil Rights Act of 1964 did not require stores to install lunch counters. But once they did, the Act entitled all persons to "full and equal enjoyment of th[os]e goods, services, facilities, privileges, advantages, and accommodations" that the stores chose to provide. 42 U.S.C. § 2000a(a).

That majority's observation that "Gil is at no less of a disadvantage than a sighted customer who does not have internet access" is also irrelevant  Maj. Op. at 28 n.20. The ADA requires us to compare Winn-Dixie's treatment of nondisabled guests ready to enjoy its services to its treatment of disabled guests ready to enjoy its services. *A.L.*, 900 F.3d 1270 ("[P]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then must take reasonable steps to provide disabled guests with a like experience.") (internal quotation marks omitted). It makes no difference whether Winn-Dixie treated nondisabled guests ready to enjoy its services like other individuals who, because of their personal circumstances, were not ready, or did not want, to enjoy its services.

Second, the majority opinion appears to resist the conclusion that Winn-Dixie violated the ADA by grafting a rule upon the Act that is supposedly derived from caselaw. The majority opinion does not dispute that it is settled law in this circuit that violations of § 12182 can result from "intangible barriers" that do not "occur on site [of a place of public accommodation]." *Rendon*, 294 F.3d at 1283–84; *see also* Maj. Op. at 25–26 n.19. Nevertheless, the majority opinion maintains that offsite intangible barriers cannot result in a § 12812 violation unless they bar customers with disabilities from the public accommodation's "sole access point" or obstruct those customers from accessing one of its "point[s] of sale." Maj. Op. at 22–23. The majority opinion apparently derives this rule from two cases in which federal courts of appeals held that plaintiffs *could* state a claim under Title III when a technological barrier prevented them from accessing the offerings of a place of public accommodation. *See Rendon*, 294 F.3d at 1283–86 (aspiring game show contestants stated a claim under Title III when an automated telephone system prevented them from enjoying the privilege of trying out for the show); *Robles*, 913 F.3d at 905–06 (holding that the ADA applied to a pizza restaurant's website and app because those technologies "connect[ed] customers to the [restaurant's] goods and services" and the technologies' alleged inaccessibility "impede[d] access to [the restaurant's offerings]").

61

The majority opinion's discussion of *Rendon* and *Robles* therefore cannot advance its position. Those cases held only that plaintiffs can state a Title III claim when inaccessible technologies prevent them from accessing a public accommodation's offerings; they had no occasion to consider whether a public accommodation might also violate the ADA when it offers a website inaccessible to visually-impaired customers that serves as the only way for a customer to access in-store privileges or advantages. At best they established only a sufficient, not a necessary, condition for stating a claim.[13]

C.

Third, the majority opinion argues that Winn-Dixie did not violate § 12182(b)(2)(A)(iii) because that provision prohibits the absence of auxiliary aids and services only when their absence prevents disabled individuals from "effective[ly] communicat[ing]" *with physical stores*. *See* Maj. Op. at 24–25 (quoting 28 C.F.R. § 36.303(c)(1)). According to the majority opinion, because

---

[13] In any event, the majority opinion is wrong in asserting that *Rendon* and *Robles* are distinct from this case in a legally significant way. *See* Maj. Op. at 21–22, 27. It is true that, in *Rendon*, unlike in this case, the inaccessible technology was the "sole access point for individuals to [seek] the privilege." *Id.* at 21. And it is true that, in *Robles*, unlike in this case, the public accommodation "[made] sales through its website and app." *Id.* at 28. But those distinctions are of no moment to the ADA, which prohibits discrimination that not only "exclude[s]" individuals with disabilities but also discrimination that "treat[s] [them] differently" and denies them the "full and equal enjoyment of [the offerings of public accommodations]." 42 U.S.C. § 12182; *see also A.L.*, 900 F.3d at 1294–98 (explaining that places of public accommodation must provide disabled patrons with an experience comparable to the one they provide nondisabled patrons).

only Winn-Dixie's stores (and not its website) are "place[s] of public accommodation," Gil's "inability to communicate with and access the services available on the website" does not constitute a violation of § 12182(b)(2)(A)(iii) because Gil could "communicate effectively with, or access the services offered in, the physical stores." *Id.* at 25–26. The majority opinion reasons that, because Gil was "able to enjoy fully and equally the services in question—filling prescriptions and using coupons—in Winn-Dixie's physical stores," there is "no basis for concluding that Winn-Dixie violated § 12182(b)(2)(A)(iii)." *Id.* at 26.

This chain of reasoning suffers from at least two defects. First, the argument is premised upon the majority opinion's position that "the services available on [Winn-Dixie's] website" are untethered from the services offered by Winn-Dixie's store. *Id.* at 25. As I have explained, that premise is flawed. Winn-Dixie offered in-store services, privileges, and advantages—namely, the ability to request express prescription refills and link coupons to one's account—through (and only through) its inaccessible website.

Second, the argument rests upon the majority opinion's misconception that Winn-Dixie's website is not a tool of communication that Winn-Dixie provided to convey information to, and receive information from, customers. By refusing to recognize that the website is, at least in part, a tool of communication between Winn-Dixie and its customers, the majority opinion arrives at the striking

63

conclusion that, although Gil proved at trial that he could not comprehend or communicate with the website, § 12182(b)(2)(A)(iii) was not violated because Gil "never asserted that he was [un]able to communicate effectively with . . . the physical stores." *Id.*

But contrary to the majority opinion's understanding, Gil's inability to access the website prevented him from effectively communicating with Winn-Dixie's stores in at least two ways. The website's inaccessibility prevented Gil from (1) accessing the information that Winn-Dixie was conveying to its sighted customers and (2) conveying information to Winn-Dixie. For example, there was no way for Gil, unlike Winn-Dixie's sighted customers, to communicate with a Winn-Dixie store that he would like to have a specific prescription refilled at a specific time. And there was no way for Gil, unlike Winn-Dixie's sighted customers, to communicate with a Winn-Dixie store that he would like to link specific coupons to his rewards card so they could be applied automatically when he purchased discounted goods. Thus, the website's inaccessibility prevented Gil from effectively communicating with Winn-Dixie's stores, violating the plain terms of the regulation requiring effective communication. 28 C.F.R. § 36.303(c)(1) ("A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities.").

Put differently, individuals and businesses communicate with each other by using communication technologies, like websites, phones, and apps. Therefore, the majority opinion's contention that Gil's inability to access the website prevented him from communicating with only the website—and not Winn-Dixie's physical stores—defies reality. A customer's ability to access a communication technology and his ability to communicate effectively with a store are not unrelated propositions, as the majority opinion suggests. Rather, those propositions are causally related. *Because* Gil was unable to use Winn-Dixie's website, he was unable to effectively communicate with Winn-Dixie's stores.

The regulation requiring effective communication provides that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). An auxiliary aid, like a website compatible with screen-reading software, was necessary to ensure effective communication between Gil and Winn-Dixie's physical stores. By failing to furnish that aid (or any alternative), Winn-Dixie ran afoul of § 36.303.[14]

---

[14] I agree with the majority opinion that there is no reason to superimpose a "nexus" standard onto the inquiry into whether a place of public accommodation violates the ADA when it offers a service, privilege, or advantage that can be attained solely by accessing its website. *See* Maj. Op. at 26–27. We need only apply the statutory text and ask whether such a website's incompatibility with screen-reading software prevents disabled customers from fully and equally enjoying the offerings of a place of public accommodation. *See* 42 U.S.C. § 12182(a).

IV.

The majority opinion holds that Title III does not require public accommodations to provide disabled individuals with the same in-store privileges and advantages that they provide nondisabled individuals when those in-store privileges and advantages are offered through a website. I disagree. Our constitutional role is "to apply statutory language, not to rewrite it." *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc). The statutory language at issue mandates that disabled individuals are not, without legal justification that is absent from this case, "excluded, denied services, . . . or otherwise treated differently . . . because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). And it entitles disabled individuals to the "full and equal enjoyment" of a public accommodation's offerings. *Id*. § 12182(a). The majority opinion's declaration that Gil could fully and equally enjoy Winn-Dixie's offerings does not make it so. Winn-Dixie treated Gil as a second-class customer, offering him different and inferior prescription and coupon services than it provided to its nondisabled customers.

I fear the majority opinion's errors will have widespread consequences. Places of public accommodation, such as stores and restaurants, increasingly use websites and apps to offer their customers safer, more efficient, and more flexible access to goods and services in physical stores. As I read it, the majority opinion

66

gives stores and restaurants license to provide websites and apps that are inaccessible to visually-impaired customers so long as those customers can access an inferior version of these public accommodations' offerings. That result cannot be squared with the ADA. Respectfully, I dissent.